IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

LEE ANN PRATHER,            )
                            )
        Plaintiff,          )
                            )
        v.                  )        NO. 14-3273
                            )
SUN LIFE FINANCIAL          )
DISTRIBUTORS, INC.,         )
                            )
        Defendant.          )

OPINION

RICHARD MILLS, U.S. District Judge:

This is an action for declaratory judgment, pursuant to 28 U.S.C. §§

2201 and 2202, and other relief.

Both parties have moved for Summary Judgment.

I. INTRODUCTION

This case is brought pursuant to ERISA § 502(e)(1) & (2), as well as

29 U.S.C. § 1132.  Plaintiff Lee Ann Prather is an individual domiciled in

Sangamon County, Illinois.  Defendant Sun Life and Health Insurance

Company (U.S.) is a corporation organized and existing under the laws of

the State of Connecticut, and doing significant business in Illinois.

Plaintiff Lee Ann Prather asserts she is entitled to accidental death and dismemberment benefits on her husband Jeremy Prather's life.  The accidental death benefits were pursuant to Mr. Prather's employer welfare benefit plan ("Plan") funded by Group Life Insurance Policy No. 54-0000 ("Policy") issued by Defendant Sun Life Financial Distributors, Inc.

The Policy was issued to the Springfield Urban League, Inc., her husband's employer.  The Plaintiff alleges that Jeremy Prather sustained an injury during a pickup basketball game which eventually led to his death.  As a result, the Plaintiff asserts she is entitled to recover accidental death benefits under the policy, in addition to reasonable attorney's fees in connection with the prosecution of the claim.

The Defendant alleges Jeremy Prather's death was attributable to natural causes and not the result of an accident.

## II. FACTUAL BACKGROUND

### (A)

Jeremy Prather was hired on December 8, 2011 by the Springfield Urban League, Inc., as a Coordinator.  Incident to his employment, Mr.

2

Prather participated in the Plan with basic life insurance and accidental death benefits funded by the Policy issued by Sun Life, which also served as the Plan's claims review fiduciary.  The Plan is subject to ERISA.

At all relevant times, Mr. Prather was an employee of the Springfield Urban League and was an insured eligible for benefits under the Policy. The group insurance coverage issued to Springfield Urban League, Inc. insures basic life and accidental death and dismemberment benefits afforded under the Springfield Urban League, Inc.'s Plan.  Mr. Prather's insurance coverage under the Group Policy includes an accidental death benefits clause, stating:

Accidental Death and Dismemberment Benefit

We will pay a benefit based on the amount shown in the Insurance Schedule if, while you are insured under the policy, you sustain bodily injuries:
1.    That result directly from an accident and independently of all other causes;
2.    That, within 365 days of the date of the accident, result in one of the losses listed below; and
3.    That are not excluded in the "Restrictions" section below.

Restrictions

We will not pay a benefit for any loss that is caused, either

3

directly or indirectly, or contributed to, by:

1.      Physical or mental infirmity or disease.

[. . .]

7.      Medical or surgical treatment.

Mr. Prather carried accidental death and dismemberment benefits in an amount 200 percent of his basic annual earnings, amounting to $93,814.79.

The Policy contains a discretionary clause which provides, in pertinent part, as follows:

Claims Fiduciary

Sun Life and Health Company (U.S.) as Claims Fiduciary, shall have the sole and exclusive discretion and authority to carry out all actions involving claims procedures explained in the Policy. The Claims Fiduciary shall have the sole and exclusive discretion and power to grant and/or deny any and all claims for benefits, and construe any and all issues relating to eligibility for benefits. All findings, decisions, and/or determinations of any type made by the Claims Fiduciary shall not be disturbed unless the Claims Fiduciary has acted in an arbitrary and/or capricious manner. Subject to the requirements of law, the Claims Fiduciary shall be the sole judgment of the standard of proof required in any claims for benefits and/or in any question of eligibility for benefits.

R. 35.

On or about July 16, 2013, Mr. Prather sustained a ruptured left Achilles tendon while playing basketball. The Plaintiff alleges Mr. Prather further developed deep vein thrombosis and a pulmonary embolism as a direct result of the accident-related injury. The Defendant asserts Mr. Prather developed deep vein thrombosis and pulmonary embolism subsequent to surgical repair of his ruptured Achilles tendon.

Following Mr. Prather's basketball-related injury, Rishi Sharma, M.D., discussed deep vein thrombosis and pulmonary embolism with him. On July 16, 2013, Mr. Prather was provided with a CAM walker with a heel lift as well as with crutches. Mr. Prather received a prescription for Vicodin. Dr. Sharma discussed immobilization as well as weight bearing as tolerated and he recommended further consultation and evaluation with Orthopedic Surgery.

On July 21, 2013, Mr. Prather reported by telephone call to the office of Jeffrey Schopp, M.D., that he experienced lower left extremity swelling

starting one or two days after rupturing his Achilles tendon.[1]  Mr. Prather denied redness, streaking, or discoloration, fever or chills, shortness of breath or chest pain and indicated he was ambulating with a boot and crutches.  He further stated that elevation seemed to decrease the swelling slightly and "there is an area on the outer aspect of his left calf that is more sensitive than the rest of his calf."  Mr. Prather also stated he was concerned about a blood clot.  He was advised to keep his leg elevated above the level of his heart and that he would be evaluated the following day prior to his surgery.

Mr. Prather was evaluated by Dr. Schopp prior to surgery.  The surgery to repair Mr. Prather's ruptured Achilles tendon went forward on July 22, 2013, with no operative complications.  The procedural notes provide that Dr. Schopp discussed anesthetic complication, infection, neurovascular injury, re-rupture, deep vein thrombosis, pulmonary embolism and the usual postoperative course.  Mr. Prather and his family

---

[1]The Defendant states that Mr. Prather's swelling started a day after the basketball-related injury, or four days prior.  However, the doctor's notes say that the injury was six days prior and the swelling began four days ago.

stated that they understood the procedure, had an opportunity to ask questions and gave consent.

On August 2, 2013, Mr. Prather presented for staple removal and was told to follow up in four weeks or sooner if any problems occurred.  On or about August 6, 2013, Mr. Prather passed away.  Mr. Prather's death resulted minutes after a pulmonary embolism and three weeks after he ruptured his Achilles tendon.  In describing the injury, the Certificate of Death provides that while Mr. Prather was playing basketball, another player stepped on his ankle, causing the tendon to rupture.  It further indicates the cause of death as "accidental," with Postmortem Report describing the same as "pulmonary embolism due to deep vein thrombosis due to left Achilles tendon rupture."

Immobilization alone is a risk factor for deep vein thrombosis leading to a pulmonary embolism.  Even with conservative treatment, which includes non-weight bearing and immobilization, the insured was at a greater than standard risk of blood clot.  Accordingly, there were risks associated with both surgery and conservative treatment.

(B)

The Plaintiff is Mr. Prather's primary beneficiary under the Policy and would be entitled to recover accidental death benefits.  She submitted a timely claim for accidental death benefits under the Policy.

The Defendant has denied the Plaintiff's claim for accidental death benefits, a decision which it upheld upon appeal.  The Plaintiff has exhausted the Plan's administrative appeals process.

The autopsy report dated September 1, 2013, revealed bilateral thromboemboli within the right and left pulmonary arteries.  "The well-formed, maroon, cylindrical blood clots measure up to 1.5 cm diameter and extend deep into the smaller arterial branches of each lung. [. . .] Cut sections show soft tissue that exudes moderate amounts of congested blood and edema fluid, along with smaller thromboemboli within the smaller artery branches."  The autopsy additionally identified blood clots within the deep veins of Mr. Prather's left leg. Forensic Pathologist Amanda J. Youmans, D.O., opined that Mr. Prather's immediate cause of death was pulmonary embolism, due to deep vein thrombosis occurring days earlier,

due to, or as a consequence of his left Achilles tendon rupture weeks earlier.

In correspondence dated October 25, 2013, Sun Life expressed its condolences for the Plaintiff's loss and forwarded a check in the amount of $93,814.79 in full payment of the group basic life insurance benefits due under the Policy.  The Defendant further informed the Plaintiff that in order to review her claim for accidental death benefits, it required a copy of Mr. Prather's complete medical records concerning his initial accident on July 16, 2013 and all subsequent treatment including his surgery on July 22, 2013, through his death on August 6, 2013.  Sun Life followed up with the Plaintiff for the requested information on November 25, 2013, and telephonically on December 3, 2013.

On or about December 10, 2013, the Defendant received the requested information.  The Defendant notes that Dr. Schopp discussed non-operative treatment in a cast versus surgical reapproximation of the tendon.  Dr. Schopp discussed the possibility of infection, neurovascular injury, deep vein thrombosis, pulmonary embolism, and the usual postoperative course with Mr. Prather.  The medical records reveal that Mr.

Prather was "motivated" to proceed with surgery for a multitude of reasons and understood the potential complications.  Mr. Prather and his wife gave consent for surgery.

On December 17, 2013, Sun Life forwarded the medical records received as well as the death certificate and autopsy report for a medical review.  The Defendant requested answers to the following questions:

- Based on the information included on the death certificate, autopsy report and medical records is it safe to conclude that Mr. Prather died of a direct result of his accident/left Achilles Tendon rupture, making this a truly accidental death?

- Can we conclude that his subsequent surgery to repair the tendon rupture played no part in the DVT/Pulmonary Embolism that caused his death?

On December 18, 2013, Sun Life received a written death claim review prepared by Wendy Haering, PA-C, CDMS.  Ms. Haering provided the following answers to the above questions:

[. . .] Answer: The condition that prompted medical care was an accidental injury to the L Achilles tendon on 7/16/2013.  The

10

claimant chose surgical repair instead of conservative management.  He was advised of the risks of intervention including DVT/PR.  On 7/21/13 he called the orthopedic surgeon's office to report that the swelling in his leg had not decreased, and was now associated with warmth and tenderness.  He was worried about a blood clot.  He was advised to elevate his leg for the remainder of the day.  Plans were made for further evaluation on 7/22/13 prior to surgery.  The surgery was performed on 7/22/13.  There were no operative complications.  Post operatively, the insured appeared well and his staples were removed on 8/2/2013.  There is documentation of a traumatic accident as the proximate cause of the events leading to surgery, and complications from surgery (DVT/PE)

[. . .]

Answer: No.  As Dr. Schopp discussed with the insured, the risks of surgery included DVT and PE.  That said, immobilization alone is a risk factor for DVT/PE.  Even with conservative treatment, which includes non-weight bearing and immobilization, the insured was at greater than standard risk of a blood clot.  It's clear from the records that he understood this risk as he voiced his concern about having a blood clot one day before his surgery.

On January 6, 2014, Sun Life received medical records pertaining to the care Mr. Prather received on August 6, 2013, prior to his death.  The medical records revealed that Mr. Prather fell at work from a standing position and coded during the transport to the hospital.  Mr. Prather was in cardiopulmonary arrest on arrival at the hospital.

11

On January 17, 2014, the Defendant denied the Plaintiff's claim, explaining:

> [. . .] To be eligible for Accidental Death Group Benefits under this policy, an insured must sustain bodily injuries that result directly from an accident and independently of all other causes. Further, in the restrictions section it is stated that we will not pay for any loss that is caused or contributed to, by medical or surgical treatment.  Jeremy Prather fully understood the risks and possible complications of surgical treatment including Deep Vein Thrombosis and Pulmonary Embolism, and subsequently gave consent for surgical treatment.  Therefore, as it appears that Jeremy Prather's death was as a result of complications from surgical treatment, we must inform you that no Accidental Death Group Benefit is due under this group policy. [. . .]

On or about February 10, 2014, the Plaintiff, through counsel, submitted an appeal, admitting that the cause of Mr. Prather's death was a "known complication of the medical treatment."  The Plaintiff contended, however, that the necessity for the medical treatment was the "accident itself" and that the Certificate of Death listed the death as an "accident" which, according to the Plaintiff, entitled her to benefits.  The Plaintiff did not advance any other arguments or address the Policy's restrictions language.

In correspondence dated February 20, 2014, the Defendant

acknowledged the Plaintiff's appeal.  On April 15, 2014, Sun Life upheld its previous denial of the Plaintiff's claim for accidental death benefits.  Sun Life noted that treatment notes showed Mr. Prather was aware of the risks associated with having surgery, in particular the potential for pulmonary embolism.  The Defendant further states that Plaintiff has acknowledged that the cause of death was "a known complication of the medical treatment."  Moreover, the Policy specifically states that Sun Life will not pay an accidental death benefit if medical or surgical treatment, or surgical treatment causes, directly or indirectly, or contributes in any way, to the death of the insured.

Following the Defendant's denial of the appeal, the Plaintiff filed the instant lawsuit.

## III. DISCUSSION

### A. Legal standard

The Parties agree that the Court must review the decision to deny benefits under an arbitrary and capricious standard.  A denial of benefits must be upheld as long as the denial has "rational support in the record."

Leipzig v. AIG Life Ins. Co., 362 F.3d 406, 409 (7th Cir. 2004). Therefore, the Court will not disturb the decision if it was "based on a reasonable interpretation of the plan's language and the evidence in the case." Russo v. Health, Welfare & Pension Fund, Local 705, Intern. Broth. of Teamsters, 984 F.2d 762, 765 (7th Cir. 1993).

The Plaintiff has the burden of showing that Mr. Prather's death satisfied the Policy's accidental death provisions. Because she seeks to enforce benefits under the Policy, the Plaintiff must prove her "entitlement to contract benefits." See Ruttenberg v. U.S. Life Ins. Co., 413 F.3d 652, 663 (7th Cir. 2005). In order to show that the decision was arbitrary and capricious, therefore, the Plaintiff must show that Mr. Prather's death resulted from bodily injuries sustained directly as a result of an accident–independently of any other cause.

B. Whether denial was arbitrary and capricious

The Plaintiff contends that the Defendant's decision to deny benefits by attributing the cause of Mr. Prather's death to medical treatment rather than accident was arbitrary and capricious because the deep vein

thrombosis occurred before his medical treatment.  Prior to his surgery, Mr. Prather contacted his physician to state he believed he had a blood clot in his calf.  Moreover, Sun Life admitted that immobilization alone is a risk factor for deep vein thrombosis leading to a pulmonary embolism for which Mr. Prather was at greater risk than standard risk of blood clot.  Thus, the Plaintiff alleges even conservative treatment involving non-weight bearing and immobilization would have led to a greater than standard risk of blood clot.

Accordingly, the Plaintiff contends that the medical procedure to repair Mr. Prather's Achilles tendon had no correlation, either directly or indirectly, to the formation of the blood clot and thus contributed no part in his death.  At the very least, Mr. Prather's death was caused by complications of a ruptured Achilles tendon.  The Plaintiff asserts that if complications of an accidental injury cause death, the law considers the death to be an accident.

The Plaintiff cites Senkier v. Hartford, 948 F.2d 1050 (7th Cir. 1991) in asserting that the denial of her claim was arbitrary and capricious.  The

15

court in Senkier observed, "In the old days courts distinguished between accidental means and accidental result."  Id. at 1052.  It further noted, "Death is almost always accidental in the sense of unintended by the deceased, so if an accidental result sufficed, coverage would be assured regardless of the cause of death."  Id.  Under the traditional view, the beneficiary would not recover proceeds under an accident policy if "there is nothing accidental in the means by which the person died."  See id.

The Court in Senkier went on to say, "It would be different if he twisted his knee playing tennis and the injury caused blood clots that embolized to his lungs and killed him. . . . Then the means of death–the injury to the knee–would be an accident, and the death would be covered."  Id.  The Plaintiff alleges that Mr. Prather's injury and resulting death is analogous to the situation described in Senkier.

Although there is a  similarity between Judge Posner's hypothetical regarding an individual's  tennis-related injury and Mr. Prather's ruptured Achilles tendon playing basketball, this Court is not interpreting the same policy as the court in Senkier.  The policy in Senkier "offer[ed] full 24 hour

protection against accidents anywhere in the world, whether you are on business, pleasure, vacation, at home, or on or off the job." Id. at 1051. The policy excluded "sickness or disease" and "medical or surgical treatment of a sickness or disease." Id. The court observed that the policy did not address "whether a mishap in the course of treatment should be classified as part of the treatment itself or as an accident." Id.

In this case, because the Policy specifies that the "bodily injuries" must "result directly from an accident and independently of all other causes" and, further, that Sun Life "will not pay a benefit for any loss that is caused, either directly or indirectly, or contributed to by . . . Medical or surgical treatment," the Court need not look beyond the words of the Policy. Clearly, Senkier is inapposite.

Here, the Policy unambiguously requires Sun Life to deny coverage and benefits if it determined that medical or surgical treatment, either directly or indirectly, contributed to Mr. Prather's death. The Defendant notes that, during the administrative review of the claim, the Plaintiff acknowledged that Mr. Prather died of a known complication of the

surgical repair of his ruptured Achilles tendon.  Given that admission, it is difficult to see how the Court could conclude that Sun Life's decision to deny the Plaintiff's claim could be found to be arbitrary and capricious.

To the extent that Plaintiff now contends Mr. Prather developed the clot which led to his deep vein thrombosis and pulmonary embolism prior to any medical intervention, there is no medical evidence in support of that assertion.  Although Mr. Prather described pain and swelling and expressed concerns about developing a blood clot in his calf during a phone call to the telenurse on July 21, 2013, there was no objective finding and the Court declines to assume that a blood clot had developed.

Wendy Haering, PA-C, CDMS, determined that Mr. Prather's ruptured Achilles tendon was the proximate cause of the events leading to surgery and the complications from surgery, which led to his death.  It is almost certain that, but for the basketball-related injury, Mr. Prather would not have needed surgery.  However, it is also undisputed that the surgical treatment he received contributed to his death.  The record further establishes that Mr. Prather acknowledged he knew the risk of developing

18

deep vein thrombosis and pulmonary embolism as a result of the procedure.

Although there was also an increased  risk of a blood clot associated with conservative treatment, including non-weight bearing and immobilization, that does not change the result here which is based on the language of the Policy.

Based on the foregoing, including the Plaintiff's acknowledgment that Mr. Prather's death could be attributed, at least in part, to complications from surgery and Ms. Haering's finding that such complications contributed to Mr. Prather's death, Sun Life had a reasonable basis to deny the benefit because his death did not "result directly from an accident and independently of all other causes."  Moreover, Sun Life had a legitimate basis to find that the loss was caused, at least "indirectly, or contributed to" by "Medical or surgical treatment."  Sun Life's denial of the claim is consistent with the language of the Policy.  Accordingly, the denial has rational support in the record.

The Court cannot without medical evidence assume that, based on his pain and swelling described in the call to the telenurse on July 21, 2013,

Mr. Prather developed deep vein thrombosis prior to surgery.  Because it was not discovered by Dr. Schopp prior to surgery on July 22, 2013, Sun Life had a reasonable basis to conclude that medical treatment contributed to Mr. Prather's death.

Accordingly, the Court cannot conclude that the Defendant's decision was  arbitrary and capricious.

### C. Conflict of interest

The Plaintiff also contends that Sun Life's decision to deny benefits was an abuse of discretion, given the Defendant's inherent conflict of interest as a fiduciary that both evaluates claims for benefits and pays out the same benefits.  A conflict of interest exists when a plan administrator has both the discretionary authority to determine eligibility for benefits and the obligation to pay benefits when due.  See Metropolitan Life Ins. Co. v. Glenn, 554 U.S. 105, 108 (2008).

It is common in ERISA cases for the plan administrator to also be the payor of claims.  See Edwards v. Biggs & Stratton Retirement Plan, 639 F.3d 355, 364 (7th Cir. 2011).  Because there is a conflict of interest in the

overwhelming majority of ERISA cases, the Seventh Circuit has held it is not the existence of a conflict that is significant.  See id.  The gravity of the conflict, based on the circumstances of the case, is the crucial factor.  See id.  The Seventh Circuit has also held:

> [T]he gravity of the conflict, and thus the likelihood that the conflict influenced the plan administrator's decision, should be inferred from the circumstances of the case, including the reasonableness of the procedures by which the plan administrator decided the claim, any safeguards the plan administrator has erected to minimize the conflict of interest, and the terms of employment of the plan administrator's staff that decides benefit claims.

Majeski v. Metropolitan Life Ins. Co., 590 F.3d 478, 482 (7th Cir. 2009) (citation omitted).  The Supreme Court has suggested that a plan's conflict of interest might be a tiebreaker if "circumstances suggest a higher likelihood that [the conflict] affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration."  Glenn, 554 U.S. at 117.

The Court concludes that no circumstances suggest that Sun Life's conflict of interest affected the denial of benefits.  The Defendant provided the Plaintiff with a thorough review, including a request for a consultant's

21

opinion.  The questions asked of the consultant tracked the language of the Policy, including whether Mr. Prather's death was a "direct result" of the accident, and whether it can be concluded that the surgery played "no part in the DVT/Pulmonary Embolism that caused his death."  The inquiries were objective and plainly designed to determine whether the Defendant was obligated to pay the benefit based on the Policy language.

The Plaintiff contends that, in determining whether there was an abuse of discretion because of the conflict of interest, the Court should consider factors such as Mr. Prather's immobilization which led to swelling and tenderness, causing "Mr. Prather to believe he had clot."  This suggests that medical intervention did not directly or indirectly contribute to Mr. Prather's death, and a decision to deny benefits is arbitrary and capricious. The Court cannot rely on speculation.  There is no record evidence to find that Mr. Prather had a blood clot prior to surgery.

Sun Life took into account the records of Mr. Prather's medical treatment, his surgery and the autopsy report.  The Defendant also relied on the independent review performed and the Policy language.  Sun Life

also approved the Plaintiff's claim for death benefits and paid benefits as mandated by the Policy.

There is no evidence suggesting that the conflict of interest affected the denial of benefits. The conflict of interest did not lead to an arbitrary and capricious decision.

The Court certainly has sympathy for Mrs. Prather's tragic loss. Because Sun Life's decision was based on a reasonable interpretation of the Policy's language and the evidence in the case, however, the denial of benefits was not arbitrary and capricious.

Ergo, the Defendant's Motion for Summary Judgment [d/e 17] is ALLOWED.

The Plaintiff's Motion for Summary Judgment [d/e 18] is DENIED.

The Clerk will enter Judgment in favor of the Defendant and terminate this action.

ENTER: March 29, 2016

FOR THE COURT:

s/Richard Mills
Richard Mills
United States District Judge

23